Eddie Mitchell TASBY and Phillip Wayne Tasby, by their parent and next friend, Sam Tasby et al., Plaintiffs-Appellants,

v.

Dr. Nolan ESTES et al. and Highland Park Independent School District et al., Defendants-Appellees.

No. 79–3465.

United States Court of Appeals,
Fifth Circuit.
Unit A

April 27, 1981.

Edward B. Cloutman, III, Thomas E. Ashton, III, Dallas Legal Services Foundation, Inc., Dallas, Tex., Thomas I. Atkins, Gen. Counsel, NAACP Special Contribution Fund, New York City, for plaintiffs-appellants.

Spafford, Gay & Whitham, Warren Whitham, Samuel J. Ferro, Jr., Strasburger & Price, Mark Martin, Dallas, Tex., for defendants-appellees.

Before AINSWORTH, CHARLES CLARK and WILLIAMS, Circuit Judges.

CHARLES CLARK, Circuit Judge:

This case is another in a long series of legal proceedings related to the process of desegregation in the Dallas Independent School District (DISD). The plaintiffs are parents of black children attending school in the DISD. They claim that the school district's student disciplinary policies and practices discriminate against black students and violate due process guarantees. The district court found that the plaintiffs' evidence did not support their allegations and denied them relief. We affirm.

### I.

Litigation to desegregate the DISD's school facilities and to eradicate the vestiges of de jure racial discrimination has occupied judicial attention in this circuit for more than twenty-five years. The actual desegregation process began in 1961 with the elimination of racial criteria for the admission of students to the DISD's schools. See Boson v. Rippy, 285 F.2d 43 (5th Cir. 1960). A decade later, the plaintiffs commenced this lawsuit to purge the remaining traces of de jure racial segregation in the DISD. The district court found that elements of the old dual school system still remained. Tasby v. Estes, 342 F.Supp. 945 (N.D.Tex.1971). Then, in April, 1976, following a remand from this court, the district court adopted a detailed student assignment plan designed to completely dismantle the dual school structure that existed in the DISD. The district court's 1976 order also embodied additional remedial measures thought necessary to carry out the constitutional mandate to establish a truly unitary school system and to ensure that the racially discriminatory practices of the DISD would be eliminated. Paragraph XII of that order addresses student disciplinary policies.

### XII. Discipline and Due Process

Good order and discipline are essential to good education and to the implementation of this plan. The DISD, in concert with teachers, principals and parents shall develop a clear and simply-stated policy on student discipline, including provision for due process procedures. All parents and students shall be fully advised by the DISD of these rules and regulations governing student conduct in the classroom, in the school, and on the campus. These

rules, regulations, and due process procedures shall be applied uniformly and fairly without discrimination.

*Tasby v. Estes,* 412 F.Supp. 1192, 1219 (N.D. Tex.1975).

In March, 1979, the plaintiffs initiated the proceedings out of which this appeal arises. They filed a Motion for Further Relief, alleging that the DISD had not developed a clear and simply-stated policy for student discipline, had failed to involve parents in the development of its student disciplinary policies, did not accord students due process in the administration of discipline, and had administered student discipline in a racially discriminatory fashion. In essence the plaintiffs' motion alleged a failure by the DISD to comply with the district court's existing desegregation order. However, the plaintiffs did not attempt to obtain a contempt citation. They sought instead the appointment of a Special Master to develop and implement a student disciplinary system, a preliminary injunction prohibiting the suspension of black students at a rate in excess of that at which white students were suspended, an order requiring the DISD to produce monthly data on student discipline, and attorneys' fees and costs.

After the plaintiffs rested following a day and a half of hearings, the DISD moved for an order dismissing the plaintiffs' Motion for Further Relief. The district court granted the motion, holding that the plaintiffs' proof was legally insufficient to establish its allegations. From this order, the plaintiffs appeal.

## II.

Initially, we must deal with the DISD's contention that there is no case or controversy sufficient to support the exercise of federal jurisdiction. The DISD asserts that the plaintiffs lack standing to bring this lawsuit because they have failed to show that any of them have actually been affected by the allegedly unlawful conduct described in their Motion for Further Relief. The DISD also maintains that the controversy is moot because the plaintiffs have not shown that any of the black students originally named in the complaint still attend school in the district and because the district court never certified this suit as a class action pursuant to Fed.R.Civ.P. 23.

The DISD's objections are unfounded. The requirement of *standing relates to the problem of "whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947, 962 (1968). The essence of the standing inquiry is whether the party seeking relief has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 396 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). There is no doubt that within the context of this litigation the plaintiffs here have the personal stake and interest that impart the concrete adverseness required by Article III. These plaintiffs were among the original group of students and parents who sought an end to racial discrimination in the DISD. In order to assure achievement of a unitary school system, the district court retained jurisdiction over the case. The plaintiffs now seek to enforce the DISD's obligations under the 1976 order of the district court, which they secured, and to obtain additional relief now believed necessary to accomplish the objectives contemplated by that order. Their interest in ensuring DISD compliance with the terms of the district court's order and in securing an end to racially discriminatory practices in the school system is no different today than when they commenced the suit. In the setting of a pending school desegregation case, the plaintiffs should not be expected to make a renewed showing of personal interest each time they bring a motion seeking additional relief.

The DISD's argument that the controversy may be moot as to the named plaintiffs is similarly without merit. The DISD does not contest the plaintiffs' stand-

ing to bring this lawsuit when it was originally filed, and there is no reason to believe that the plaintiffs have necessarily lost their personal stake in the outcome of this litigation during the intervening years. Of course, a school desegregation case can become moot if it is not certified as a class action, the named plaintiffs have graduated from school, and there is no other factor which avoids mootness. *See Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 429–30, 96 S.Ct. 2697, 2701–02, 49 L.Ed.2d 599, 604–05 (1976). If the DISD thought that the plaintiffs no longer resided within the school district or had graduated from school, then the way was open for it to make such a showing. In the absence of proof by the DISD that the plaintiffs no longer have a present interest in this litigation, we hold that this action was properly maintained in the district court.

### III.

■ We now turn to the merits of the appeal. First, the plaintiffs assert that the DISD has not complied with Paragraph XII of the district court's 1976 remedial order because it has failed to include parents in the process of formulating disciplinary policies and procedures. However, the district court found no evidence showing non-compliance by the DISD, and deference to its determination of the standard of compliance required by its own order is most appropriate. The extent of parental involvement required under the terms of the court's 1976 order is not altogether clear. Plainly the focus of Paragraph XII is not on participation of parents but on the development of disciplinary policies that are free from racial discrimination. Parental involvement is clearly no more than an adjunct means to accomplish that primary goal. Thus, whether the DISD has satisfactorily complied with this requirement is a decision largely committed to the judge who entered the order.

The plaintiffs next complain that the DISD's disciplinary practices are inconsistent with the demands of due process and that they are insufficient guarantees against racial discrimination in light of the history of segregation in the DISD. Under current DISD practice, serious student offenses are examined by a Third Party Hearing Board composed of one black, one white, and one Mexican-American. All students are given a full hearing with the rights to call and cross-examine witnesses and to be represented by counsel. Ordinarily the school principal presents the evidence against the student. If the student is represented by a lawyer, the district's attorney performs this function and advises the Board on the law. Although students have the right to call witnesses, they cannot bring a teacher without the principal's permission or bring a fellow student without his parent's permission. The plaintiffs object to the use of the DISD's attorney as prosecutor in some cases before the Board, the admission of hearsay evidence from teachers, and the requirement that witnesses called by accused students must receive permission from the principal or their parents.

■ These objections present no constitutional wrongs. The plaintiffs have made no showing that any student has ever been denied the right to bring a necessary witness before the Hearing Board, and rights in a student disciplinary hearing may properly be determined upon the hearsay evidence of school administrators who investigate disciplinary infractions. *Boykins v. Fairfield Board of Education*, 492 F.2d 697, 701 (5th Cir. 1974). Moreover, the involvement of the school district's attorney in the disciplinary proceedings does not necessarily endanger the impartiality and integrity of the fact-finding process. *Cf. Murray v. West Baton Rouge Parish School Board*, 472 F.2d 438, 443 (5th Cir. 1973) (school superintendent may conduct suspension hearings). The standards of due process are not inflexible absolutes unrelated to time, place, and circumstances. *See Ferguson v. Thomas*, 430 F.2d 852, 856 (5th Cir. 1970). The plaintiffs here have failed to demonstrate any violation of these standards.

■ The plaintiffs also object to the DISD's procedures for giving notice of dis-

ciplinary rules and regulations and notice of a violation. On their face, these practices are also consistent with the constitutional requirements. *See Shanley v. Northeast Independent School District*, 462 F.2d 960, 970–71 (5th Cir. 1972); *Dunn v. Tyler Independent School District*, 460 F.2d 137, 142 (5th Cir. 1972).

## IV.

Finally, the plaintiffs contend that the DISD's administration of student discipline unconstitutionally discriminates against black students. In their view, statistical evidence showing disproportionate punishment of black students in the DISD and prior judicial findings of racially discriminatory enforcement of disciplinary procedures combine to establish a prima facie case against the school district. They argue that the district court should have placed the burden on the DISD to prove that the statistical imbalance was not the product of racial discrimination.

The plaintiffs' evidence consists of DISD student discipline data, analysis of the data by expert witnesses, and the experts' evaluation of that analysis. For the most part, the plaintiffs' experts focused on student discipline in the DISD from three perspectives. First, they examined the percentage of disciplinary cases for each race in comparison with the percentage of that race's enrollment in the district. From this analysis, the plaintiffs sought to prove that black students were disciplined more frequently than white and Mexican-American students. Second, the statistical evidence reveals that black students receive a share of the most extreme forms of punishment greater than their proportion in the DISD student population indicates they should receive. It also shows that for some kinds of disciplinary infractions they receive the most severe sanctions more often than their white counterparts. From this kind of evidence, the plaintiffs argue that blacks are disciplined more severely than other students in the DISD. Third, the statistical data reveals that the disparity between the frequency with which white and black students are disciplined is most acute in schools having a large difference between the percentage of white faculty members and the percentage of black students and in schools having white student enrollments greater than the district-wide average. The plaintiffs' position is that this evidence demonstrates that the most significant factor influencing the disparities in punishment for black and white students is the imbalance between the race of faculty members and the race of students.

■ Because we will assume for the purposes of the argument that the plaintiffs' evidence reflects a statistically significant disparity between the frequency and severity of punishment accorded black and white students, it is unnecessary to recite that evidence in any detail. We also recognize that prior judicial determinations of racial discrimination in the DISD's student disciplinary policies and practices make this statistical evidence more persuasive. However, we affirm the district court's conclusion that it is insufficient to establish a prima facie case of racial discrimination by the school district.[1]

Official conduct is not unconstitutional merely because it produces a disproportionately adverse effect upon a racial minority. The decisions of the Supreme Court in many contexts reiterate the basic equal protection principle that the uneven conse-

---

1. If the record in this case contained proof that black students received more severe punishment than white students for the same disciplinary offenses when all other factors were virtually equal, a prima facie case of racial discrimination might have been made. The record does not establish this state of affairs, however, for the statistics offered are based upon a breakdown of offenses far too general to prove disproportionate severity in punishment. The statistical list of offenses includes "cutting class", "disobedience", "profanity", "fighting", and "throwing objects". But these categories do not sufficiently permit comparison of the severity of any particular instance of misconduct with that of any other. Furthermore, the statistics do not reflect other relevant circumstances surrounding each individual case of punishment for these general infractions. For example, they do not take into account prior offenses by the student or the commission of more than one offense at the same time.

**1108**

quences of governmental action claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose. *See City of Mobile v. Bolden*, 446 U.S. 55, 65–66, 100 S.Ct. 1490, 1499–1500, 64 L.Ed.2d 47, 57–58 (1980) (elections); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450, 464 (1977) (zoning); *Washington v. Davis*, 426 U.S. 229, 239–46, 96 S.Ct. 2040, 2047–50, 48 L.Ed.2d 597, 607–11 (1976) (public employment); *Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548, 563 (1973) (public schools). "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." *Washington v. Davis*, 426 U.S. at 242, 96 S.Ct. at 2049, 48 L.Ed.2d at 608. Thus, *Washington v. Davis, supra,* upheld a job-related employment test that white applicants passed in proportionately greater numbers than black applicants because there was no showing that racial discrimination entered into the formulation or the adoption of the test. *Village of Arlington Heights, supra,* upheld a zoning board decision that tended to perpetuate racially segregated housing patterns since, apart from its effect, the board's decision was not shown to be anything more than an application of a racially neutral zoning policy.

Similarly, the plaintiffs here have failed to meet their burden of proving that the administration of student discipline in the DISD is motivated by a discriminatory purpose. Of course, evidence of disparate racial impact may provide an "important starting point." *Village of Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465. But statistical proof that black students are disciplined more frequently and more severely than white and Mexican-American students has limited probative value. Student discipline is fundamentally unlike student assignment and transfer, faculty hiring and discharge, the allocation of economic resources, and the like. In those cases, decisions by school officials which bear more heavily on one race than another may reflect disparate

treatment that cannot be explained on grounds other than race. It is therefore appropriate in these cases to place the burden on the defendant to show that the disproportionate racial consequences of the decision were not the product of a racially discriminatory purpose.

However, no inference of discriminatory intent is warranted from the facts presented by the plaintiffs, for their statistical evidence fails to account for the many variables at work in the process of disciplining school children. Too many legitimate, non-racial factors are involved to permit an inference of discriminatory purpose from a showing of disproportionate impact, even when it occurs in the context of on-going desegregation efforts. Black and white students in the DISD may not commit disciplinary infractions at the same rate or of the same seriousness, and this differential may be accounted for in non-racial terms. In addition, school administrators and teachers are properly concerned with balancing numerous competing considerations when deciding how properly to discipline a student, including the personal history and individual needs of a student, the flagrancy of his offense, and the effect that the misconduct may have on other students. Thus, the aggregate effect of individual disciplinary decisions independently made is not as convincing as the disparate racial impact that results from decisions rendered by a single governing body. Accordingly, absent a showing of arbitrary disciplinary practices, undeserved or unreasonable punishment of black students, or failure to discipline white students for similar misconduct, the plaintiffs have not satisfied their burden of proving that the disproportionate punishment of black students in the DISD is the product of a racially discriminatory purpose. *See Sweet v. Childs*, 507 F.2d 675, 680–81 (5th Cir. 1975).

AFFIRMED.