**PEOPLE WHO CARE, et al., Plaintiffs,**

v.

**ROCKFORD BOARD OF EDUCATION, SCHOOL DISTRICT NO. 205, Defendant,**

and

**Rockford Education Association, Rockford Building Maintenance Association, and Education Office Personnel Association, Intervenors–Defendants.**

**No. 89 C 20168.**

United States District Court, N.D. Illinois, Western Division.

May 7, 1998.

Jonathan A. Rothstein, Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., Chicago, IL, David P. Faulkner, Amy E. Shappert, Lord, Bissell & Brook, Jeffry S. Spears, Hinshaw & Culbertson, Rockford, IL, Ronald L. Futterman, Robert C. Howard, Claire T. Hartfield, Kathleen Mangold Spoto, Futterman & Howard, Chtd., Jennifer Louise Fischer, Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., Chicago, IL, Janet L. Pulliam, Denise Reid Hoggard, Pulliam Law Offices, P.A., Little Rock, AR, Eugene Eubanks, Dr., Kansas City, MO, for Larry Hoarde, Chasty Hoarde, Jonathan Hughes, Cindy Malone, Shaheed Saleem, Anissa Tripplett, Asia Eason, Stephanie Burfield, Joshua Burfield, Brandon Burfield, People Who Care, Sidney Malone, Andre Malone, James Curtin, Kelly Curtin and Leonardo Medrano.

Denise S. Poloyac, Katz, Friedman, Schur & Eagle, Chtd., Chicago, IL, Stephen Gary

Katz, Krukowski & Costello, Milwaukee, WI, for Rockford Education Association.

Albert Lynn Himes, Anthony Gael Scariano, Lawrence Jay Weiner, George Robb Cooper, Justino D. Petrarca, Scariano, Kula, Ellch & Himes, Chtd., Chicago, IL, Gary Richard Kardell, Stephen T. Moore, Thomas J. Lester, Hinshaw & Culbertson, Rockford, IL, David P. Kula, John M. Izzo, Scariano, Kula, Ellch & Himes Chtd., Chicago Heights, IL, William J. Quinlan, Rockford Public Schools, Rockford, IL, for Rockford Board of Education School District # 205, Jacquelyn Confer, Avery Gage, Terry Hodges, Jo Minor, George Stevens, Fred III Wham and Michael Williams.

Barbara Jean Buhai, Katz & Buhai, P.C., Barrington, IL, Charles F. Thomas, Thomas J. Lester, Patrick H. Agnew, Hinshaw & Culbertson, Peter D. DeBruyne, DeBruyne, Yalden & Olsen, Peter Alexander, Alexander & Cicero, P.C., Rockford, IL, for Rockford Education Association, Rockford Building Maintenance Association, Educational Office Personnel Association, Milestone, Inc., Theodore Biondo and Patricia Delugas.

## ORDER

MAHONEY, United States Magistrate Judge.

### I. INTRODUCTION

On December 22, 1997, petitioners Theodore Biondo, Patricia Delugas, and David L. Strommer (collectively, "petitioners"), all members of the Rockford Board of Education (School District No. 205) ("RSD Board"), filed their "motion to intervene." *People Who Care v. Rockford Board of Education, School District No. 205,* No. 89 C 20168 (N.D. Ill. December 22, 1997, Docket Nos. 2881). Also on December 22, 1997, petitioners filed their "motion to vacate order." *People Who Care,* No. 89 C 20168 (N.D. Ill. December 22, 1997, Docket No. 2882).

On January 2, 1998, petitioners filed the following: (1) petitioners' "motion for leave to amend." *People Who Care,* No. 89 C 20168 (N.D. Ill. January 2, 1998, Docket No. 2886); (2) petitioners' amendment to motion to intervene, consisting of paragraphs 13–20;

(3) petitioners' brief in support of motion to intervene; and (4) petitioners' "amended motion to vacate order and response and objection to Plaintiffs' motion for findings, sanctions and enforcement actions." *People Who Care,* No 89 C 20168 (N.D. Ill. January 2, 1998, Docket No. 2887).

For the reasons stated in this order, the following motions are denied: (1) petitioners' "motion to intervene," filed December 22, 1997; and (2) petitioners' related motion to vacate order, filed December 22, 1997.

Further, as explained below, the following motions are moot: (1) Petitioners' "amended motion to vacate order and response and objection to Plaintiffs' motion for findings, sanctions and enforcement actions," filed January 2, 1998; and (2) petitioners' motion for leave to amend, filed January 2, 1998.

### II. BACKGROUND

On September 12, 1997, the court ruled on the Master's FY 98 expenditure plan and the RSD's objections thereto. *People Who Care,* No. 89 C 20168 (N.D. Ill. September 12, 1997, Docket No. 2775). In the September 12, 1997 order, the court adopted the Master's FY 98 CRO expenditure plan, albeit with some changes. Also in the September 12, 1997 order, the court directed the RSD to submit "the RSD's plan for funding the expenditure plan . . .". *Id.*

On September 24, 1997, the RSD filed its "report required pursuant to September 12, 1997 order." *People Who Care,* No. 89 C 20168 (N.D. Ill. September 24, 1997, Docket No. 2781). In the RSD's September 24, 1997 report, the RSD stated the following:

It is inconceivable that [the] RSD could fund the remedial relief required by the Court's Expenditure Plan for FY 98 out of its general operating funds . . . . As a result, RSD assumes that this Court can and will enter an Order consistent with the September 12, 1997 Order finding that the Court ordered Expenditure Plan is a supplemental judgment issued in connection with the CRO and previously entered liability findings which found that RSD had committed constitutional torts when it violated the Plaintiffs' constitutional rights.

Upon entry of such an Order, RSD will be bound under State law to levy a tax under the Illinois Tort Immunity Act to pay for such supplemental judgment.

*People Who Care,* No. 89 C 20168 at 2–3 (N.D. Ill. September 24, 1997, Docket No. 2781).

On November 6, 1997, the court entered the RSD's proposed supplemental judgment order as requested by the RSD on September 24, 1997. As pointed out by the RSD on September 24, 1997, the RSD was then "bound under State law to levy a tax under the Illinois Tort Immunity Act to pay for such supplemental judgment." *People Who Care,* No. 89 C 20168 (N.D. Ill. September 24, 1997, Docket No. 2781); *People Who Care,* No. 89 C 20168 (N.D. Ill. November 6, 1997, Docket No. 2808).

Also on November 6, 1997, Judge Rapp of the Circuit Court of Carroll County, Illinois, issued an opinion stating that for consent decree levy years 1991 through 1993, the Illinois Tort Immunity Act did not permit use of tort levies to pay for those remedies. *See People Who Care,* No. 89 C 20168 at 11–14 (N.D. Ill. December 22, 1997, Docket No. 2879) (Transcript for December 2, 1997 proceedings). However, Judge Rapp's November 6, 1997 opinion did not constitute a final order or an injunction, as explained by RSD counsel Thomas Lester:

MR. LESTER: I mean, there is no injunction prohibiting the district to levy under the Tort Immunity Act nor is there any order directing them to do so.

THE COURT: In fact, the last time I asked you the question, your answer was no. Has anything changed? Is there any legal impediment that prevents the board from fully funding the CRO through the tort levy?

MR. LESTER: I believe I just said currently there is no injunction in place or court order which prohibits the district from levying under the Tort Immunity Act. Similarly, there is no order directing them to do so.

THE COURT: Is the district requesting such an order?

MR. LESTER: No, your honor.

*People Who Care,* No. 89 C 20168 at 29–30 (N.D.Ill. December 22, 1997) (Transcript for December 16, 1997 hearing). Altogether, RSD counsel stated (1) that no court order and/or injunction prevented the RSD from levying pursuant to the Tort Immunity Act to fund the FY 98 CRO expenditure plan and FY 98 COPs debt service; and (2) that the RSD was not requesting an order from the District Court specifically directing the RSD to levy pursuant to the Tort Immunity Act.

On November 24, 1997, Plaintiffs People Who Care, et al. ("Plaintiffs") filed their "motion for revenue generation order concerning the FY 98 CRO remedial operating budget and the FY 98 COPs debt service levy." *People Who Care,* No. 89 C 20168 (N.D. Ill. November 24, 1997, Docket No. 2814). Plaintiffs' November 24, 1997 motion for revenue-generation order requested that the court specifically direct the RSD to levy pursuant to the Tort Immunity Act. As the court understood Plaintiffs' concerns, Plaintiffs believed that the RSD Board would not levy pursuant to the Tort Immunity Act to fund the FY 98 CRO expenditure plan and the FY 98 COPs debt service. More specifically, Plaintiffs believed that the RSD Board would not levy prior to December 30, 1997, thereby leading to the financial collapse and resulting complete shutdown of the Rockford Public Schools during FY 98.

On December 8, 1997, the court denied Plaintiffs' November 24, 1997 "motion for revenue generation order concerning the FY 98 remedial operating budget and FY 98 COPs debt service" by the following order:

On September 12, 1997, the court ruled on the Master's FY 1998 Comprehensive Remedial Order ("CRO") expenditure plan and the Rockford Board of Education, School District No. 205 ("RSD") objections thereto. In the September 12, 1997 order, the court adopted the Master's FY 1998 CRO expenditure plan, albeit with some changes. *People Who Care,* No. 89 C 20168 (N.D. Ill. September 12, 1997, Docket No. 2775). Also in the September 12, 1997 order, the court directed the RSD to submit "the RSD's plan for funding the expenditure plan as put forward by this court and the Master." *People Who Care,*

No. *89 C 20168* (N.D.Ill. September 12, 1997).

On September 24, 1997, the RSD filed its "report required pursuant to 9/12/97 order" (the "RSD's report"). *People Who Care*, No. 89 C 20168 (N.D. Ill. September 24, 1997, Docket No. 2781). In the RSD's report, the RSD explained that the RSD has consistently suffered significant deficits in its general operating fund. *Id.* Clearly, the RSD cannot reasonably fund the FY 1998 CRO expenditure plan through its general operating fund.

In the RSD's report, the RSD "assumed that this Court can and will enter" an order directing the RSD to levy under the Tort Immunity Fund to provide the revenue needed for the FY 1998 expenditure plan. *Id.*

In addition to the FY 1998 CRO expenditure plan, the RSD must make debt service payments in FY 98 on the Certificates of Participation ("COPs") which were issued earlier this year to pay for CRO-ordered school construction. The debt service payments total approximately $4.1 million. Of this $4.1 million, approximately $900,000 will come from the lease levy, leaving a total of approximately $3.2 million for which a revenue source is needed. Clearly, the RSD cannot reasonably fund FY 1998 COPs debt service through the general operating fund.

On September 18, 1996, the court explicitly directed the RSD to utilize the tort levy to generate the full amount required to fund the FY 1997 CRO expenditure plan. *People Who Care*, No. 89 C 20168 (N.D.Ill. September 18, 1996). In Plaintiffs' motion for a revenue-generation order, Plaintiffs ask the court to issue a similar order with respect to (1) the FY 1998 CRO expenditure plan, and (2) FY 1998 COPs debt service.

However, the court cannot be expected to continuously spoon-feed the RSD regarding every aspect of CRO implementation. The CRO states unequivocally that "it is the responsibility of the [Rockford School] District to fully fund all CRO remedies." *People Who Care*, No. 89 C 20168 at 214 (N.D. Ill. June 7, 1996, Docket No. 2203). Therefore, the FY 1998 CRO expenditure plan must be funded. The FY 1998 COPs debt service must be funded. By levying pursuant to the Tort Immunity Fund, the RSD can fund the FY 1998 CRO expenditure plan and FY 1998 COPs debt service. Altogether, the RSD should require decreasing involvement from the court, rather than increasing involvement and continuous direction. If the [RSD] Board does not intend in good faith to implement the CRO, the court will have to look at alternatives.

Therefore, Plaintiffs' motion for a revenue-generation order is denied as unnecessary.

*People Who Care*, No. 89 C 20168 (N.D. Ill. December 8, 1997, Docket Nos. 2844, 2845).

In the days following the court's December 8, 1997 order, the RSD Board demonstrated that it did not intend to fund the CRO. At its December 9, 1997 meeting, the RSD Board failed to levy pursuant to the Tort Immunity Act. Therefore, the FY 1998 CRO expenditure plan and FY 1998 COPs debt service remained unfunded. The RSD Board would have adopted the necessary levies at the December 9, 1997 meeting but for the exit of Board Members Biondo and Delugas. By leaving the December 9, 1997 meeting, RSD Board members Biondo and Delugas defeated the quorum necessary to pass the levies.

Following the December 9, 1997 performance, on December 11, 1997, Plaintiffs filed their "renewed motion for a revenue generation order concerning the FY 98 remedial operating budget and the FY 98 COPs debt service levy." *People Who Care*, No. 89 C 20168 (N.D. Ill. December 11, 1997, Docket No. 2855).

On December 15, 1997, Plaintiffs filed their motion for expedited discovery, in which Plaintiffs requested authorization to take the depositions of the RSD Board members at the Federal Building in Rockford, Illinois, on December 17 and 18, 1997.

At the December 16, 1997 RSD Board meeting, the RSD Board was reminded by RSD Superintendent Epps and Chief Financial Officer Corby of the following: (1) The

RSD Board was obligated to fund the FY 98 CRO expenditure plan; (2) the RSD Board was obligated to fund FY 98 COPs debt service; (3) a levy pursuant to the Tort Immunity Act was necessary to fund the FY 98 CRO expenditure plan and FY 98 COPs debt service; and (4) Judge Rapp's opinion did not prevent the RSD Board from levying pursuant to the Tort Immunity Act. *People Who Care,* No. 89 C 20168 at 2–6 (N.D. Ill. December 22, 1997, Docket No. 2880) (Transcript for the December 16, 1997 hearing).

Nevertheless, on December 16, 1997, the RSD Board again failed to adopt the necessary levies by a vote of 3–3.[1]

At a status hearing later on December 16, 1997, counsel for the RSD reported to the court that the RSD Board had passed all non-CRO tax levies, but had failed to pass levies to fund the FY 98 CRO expenditure plan and the FY 98 COPs debt service. Counsel for the RSD also reported that the RSD Board had no alternative plan to fund the FY 98 CRO expenditure plan and the FY 98 COPs debt service, and that the RSD Board had been informed by Superintendent Epps and Chief Financial Officer Corby that failure to adopt these levies would result in the financial collapse of the RSD and the consequent shutdown of the Rockford Public Schools during 1998. *People Who Care,* No. 89 C 20168 at 2–6 (N.D. Ill. December 22, 1997, Docket No. 2880) (Transcript for the December 16, 1997 hearing).

Also on December 16, 1997, Plaintiffs filed their "motion for findings, sanctions, and enforcement actions concerning the Rockford Board of Education's failure and refusal to adopt tort immunity levies necessary to fund FY 98 CRO and COPs remedies." *People Who Care,* No. 89 C 20168 (N.D. Ill. December 16, 1997, Docket No. 2859).

On December 16, 1997, Plaintiffs' December 15, 1997 motion for expedited discovery

was granted: "The court orders all Board members, Superintendent Epps, and the Chief Financial Officer of the RSD to be available for depositions at 211 S. Court St. all day on 12/17/97 and 12/18/97, beginning at 9 AM." *People Who Care,* No. 89 C 20168 (N.D. Ill. December 16, 1997, Docket No. 2860).

On December 17 and 18, 1997, Plaintiffs took the depositions of Superintendent Epps, CFO Corby, and the six remaining RSD Board members. The deposition testimony of these persons indicated that the RSD Board would levy pursuant to the Tort Immunity Fund only if ordered to do so by the District Court, despite the fact that "there [was] no injunction in place or court order which prohibit[ed] the District from levying under the Tort Immunity Act." *See People Who Care,* No. 89 C 20168 at 29–30 (N.D.Ill. December 22, 1997) (Transcript for December 16, 1997 hearing).

On December 18, 1997, the court made the following ruling:

Taking into consideration the deposition testimony of all Rockford School Board members, Chief Financial Officer Matthew Corby, and Superintendent Dr. Ronald Epps, the court orders Carol Bell, *in her official capacity* as a member of the Rockford Board of Education, School District No. 205, Theodore Biondo, *in his official capacity* as a member of the Rockford Board of Education, School District No. 205, Gloria Cudia, *in her official capacity* as a member of the Rockford Board of Education, School District No. 205, Patricia Delugas, *in her official capacity* as a member of the Rockford Board of Education, School District No. 205, Alice Saudargas, *in her official capacity* as a member of the Rockford Board of Education, School District No. 205, and David Strommer, *in his official capacity* as a member

---

1. On December 16, 1997, the RSD Board consisted of only six members. Normally, the RSD Board consists of seven members. However, on December 8, 1997, RSD Board President William Neblock resigned from his RSD Board position following Mr. Neblock's altercation with fellow RSD Board member David L. Strommer in front of the *Hinshaw & Culbertson* offices, 100 Park Avenue, Rockford, Illinois. *See People Who*

*Care,* No. 89 C 20168 at 14 (N.D. Ill. December 16, 1998, Docket No. 2880) (Transcript for the December 16, 1998 hearing). Consequently, the RSD Board consisted of only six members until February 18, 1998, when William Neblock was appointed by Regional Superintendent Richard L. Fairgraves to fill the vacancy left by William Neblock's December 8, 1997 resignation.

of the Rockford Board of Education, School District No. 205, *to take whatever action is necessary* to adopt levies pursuant to the Illinois Tort Immunity Act in amounts sufficient to fully fund: (1) the FY 1998 CRO expenditure plan, and (2) FY 1998 COPs debt service, by December 23, 1997, at 10:30 AM.

The court finds:

1. That the Rockford School Board has failed to adopt the tort levy by a 3–3 vote.

2. That the Rockford School Board does not intend to take any further action prior to December 30, 1997.

3. That by state law the levy must be in place by December 30, 1997.

4. That Superintendent Dr. Ronald Epps stated under oath on December 17, 1997, that if the tort levy is not approved by the Board before December 30, 1997, "the district would be incapable of sustaining its operations, the best case scenario, [the Rockford Public Schools would close down] by October of the next school year . . . the worst case scenario, we would shut down before January [1998] is over if the most negative information is correct." *People Who Care*, No. 89 C 20168 at 42 (N.D. Ill. December 17, 1997, deposition transcript of Dr. Ronald Epps).

5. That Chief Financial Officer Mr. Matthew Corby agrees with the financial assessment of Dr. Epps. *People Who Care*, No. 89 C 20168 (N.D. Ill. December 17, 1997, deposition of Mr. Matthew Corby).

6. That no Board member has a credible plan to fund the CRO and the schools.

7. That without this order, the Rockford Public Schools will close down and stop all operations by Fall 1998, at the very latest.

8. That there is no legal impediment to levying pursuant to the Tort Fund.

9. Attached to this order is a memorandum opinion of Judge Philip G. Reinhard. The court adopts the reasoning of Judge Reinhard's opinion, and holds that the Supreme Court of the State of Illinois would allow the use of the tort levy to fully fund (1) the FY 1998 CRO expenditure plan, and (2) FY 1998 COPs debt service.

The court sets this case for a status hearing on December 23, 1997 at 11:30 AM.

*People Who Care*, No. 89 C 20168 (N.D. Ill. December 18, 1997, Docket No. 2862) (the "December 18, 1997 order") (emphasis supplied).[2]

At a special RSD Board meeting held on December 22, 1997, the RSD Board voted 6–0 to levy pursuant to the Tort Immunity Act to fund the FY 98 CRO expenditure plan and the FY 98 COPs debt service. The RSD Board did *not* vote to appeal the court's December 18, 1997 order. Rather, the RSD Board tied 3–3 when they voted regarding a possible appeal of the December 18, 1997 order. *People Who Care*, No. 89 C 20168 at 14–15 (N.D. Ill. January 2, 1998, Docket No. 2888).

Also on December 22, 1997, RSD Board members Theodore Biondo, Patricia DeLugas, and David Strommer (the "petitioners") filed their motion to intervene. *People Who Care*, No. 89 C 20168 (N.D. Ill. December 22, 1997, Docket No. 2881).

At the December 23, 1997 status hearing, counsel for the RSD reported to the court that the RSD had complied with the court's December 18, 1997 order.

On January 2, 1998, petitioners filed their "motion for leave to amend." *People Who Care*, No. 89 C 20168 (N.D. Ill. January 2, 1998, Docket No. 2886). Also on January 2, 1998, the petitioners filed their proposed amendment to their motion to intervene, which includes numbered paragraphs 13–20. *People Who Care*, No. 89 C 20168 (N.D. Ill. January 2, 1998, Docket No. 2887) ("proposed amendment"). In the proposed amendment, the petitioners explain their reasons for filing the motion for leave to amend: "[F]or the additional, limited purpose of defending against the PWC plaintiffs' pending motion for findings, sanctions and enforce-

2. Similarly, on September 18, 1996, the court ordered the RSD "to immediately utilize the tort levy to generate $23,449,152.00 in order to fund the FY 97 desegregation expenditure plan." *Peo-ple Who Care*, No. 89 C 20168 (N.D. Ill. September 18, 1996, Docket No. 2387). The RSD did not appeal the September 18, 1996 order.

ment actions against them . . .". *People Who Care,* No. 89 C 20168 at 1 (N.D. Ill. January 2, 1998, Docket No. 2887).

On January 20, 1998, Plaintiffs filed their motion for leave to amend their December 16, 1997 "motion for findings, sanctions, and enforcement actions concerning the Rockford Board of Education's failure and refusal to adopt tort immunity levies necessary to fund FY 98 CRO and COPs remedies." *People Who Care,* No. 89 C 20168 (N.D. Ill. January 20, 1998, Docket No. 2900). Plaintiffs' motion for leave to amend states, in relevant part, the following:

1. Plaintiffs wish to reduce the scope of their original motion in the following respects:

a. Withdraw all requests for sanctions, actions or findings against any individual board members;

b. Withdraw all requests for civil contempt findings and sanctions against the Board, since such findings and sanctions are for the purpose of coercion and the need for coercion was eliminated on December 23, 1997 when the Board adopted the real estate tax levies necessary to fund the FY 1998 CRO annual operating and debt service financial obligations.

c. Withdraw all requests for Rule 70 relief, in light of the Board's action on December 23, 1997.

2. The Plaintiffs will retain in their Amended Motion their request for findings regarding the bad faith conduct of the Rockford Board of Education. Under the Supreme Court's decision in *Freeman v. Pitts,* such findings are appropriate and necessary to this Court's ultimate determination of unitariness.

*People Who Care,* No. 89 C 20168 (N.D. Ill. January 20, 1998, Docket No. 2900). Plaintiffs' January 20, 1998 motion for leave to amend was granted on January 23, 1998. *People Who Care,* No. 89 C 20168 (N.D. Ill. January 23, 1998, Docket No. 2903).

Consequently, Plaintiffs' "amended motion for bad faith filings" replaced Plaintiffs' December 16, 1997 motion, and states, in part, the following:

1. For the second year in a row, the Rockford Board of Education purposely refused to adopt the real estate tax levies necessary to fund CRO annual operating and debt service financial obligations.

2. The conduct of the Board of Education was in bad faith, and demonstrates a lack of commitment to its constitutional obligations and to the whole of this Court's remedial decree.

3. The conduct of the Board placed this Court in the position of having to enter a judicial directive on December 18, 1997 specifically ordering the Board to adopt the real estate tax levies.

4. It was only after receiving this specific judicial directive, and despite having been obligated prior to entry of that order to provide for the funding of the CRO, that the Board finally, on December 23, 1997, adopted the real estate tax levies.

5. The full factual context of the Board's conduct reveals the depth of the Board's bad faith . . . under the requirements of *Freeman v. Pitts* . . . . [T]he Plaintiffs respectfully request that the court make appropriate findings of bad faith conduct by the Rockford Board of Education.

Plaintiffs' amended motion for bad faith findings at 1–2.

## III. DISCUSSION

### A. PETITIONERS' MOTIONS BEFORE THE COURT

Petitioners' "amended motion to vacate order and response and objection to Plaintiffs' motion for findings, sanctions and enforcement actions," filed January 2, 1998, and petitioners' motion for leave to amend, also filed January 2, 1998, are moot. Petitioners stated that their January 2, 1998 "amended motion to vacate order and response and objection to Plaintiffs' motion for findings, sanctions and enforcement actions" was filed "for the additional, limited purpose of defending against the PWC plaintiffs' pending motion for findings, sanctions and enforcement actions against them . . .". *People Who Care,* No. 89 C 20168 (N.D.Ill. January 2, 1998). However, Plaintiffs "motion for findings, sanctions, and enforcement actions con-

cerning the Rockford Board of Education's failure and refusal to adopt tort immunity levies necessary to fund FY 98 CRO and COPs remedies," filed December 16, 1997, has been withdrawn by Plaintiffs and replaced by Plaintiffs' "amended motion for bad faith findings." Since Plaintiffs' December 16, 1997 motion for findings, sanctions and enforcement actions has been withdrawn, the petitioners' January 2, 1998 amendments are moot.

Consequently, the following motions of petitioners remain: (1) petitioners' motion to intervene, filed December 22, 1997; and (2) petitioners' companion motion to vacate order, also filed December 22, 1997.

In petitioners' motion to intervene, petitioners argue that they have the right to intervene in the *People Who Care* case in order to dispute the authority of the District Court to order the RSD to levy pursuant to the Tort Immunity Act: "The [petitioners] challenge this Court's authority to order them to vote for [Tort Immunity Act] taxes because they [petitioners] do not believe the School Board has the lawful authority … to levy taxes … pursuant to the so-called 'tort fund' provisions of the Tort Immunity Act, 745 ILCS 10/9–107 (1996), in order to fund the cost of complying with the agreed or court ordered equitable remedies." *People Who Care*, No. 89 C 20168 at 2 (N.D. Ill. December 22, 1997, Docket No. 2881).

Petitioners' related motion to vacate order moves for the nullification of the court's December 18, 1997 order directing the RSD Board "to take whatever action is necessary to adopt levies pursuant to the Tort Immunity Act in amounts sufficient to fully fund (1) the FY 1998 CRO expenditure plan, and (2) FY 1998 COPs debt service, by 12/23/97 at 10:30 AM." *People Who Care*, No. 89 C 20168 (N.D. Ill. December 18, 1997, Docket No. 2862).

## B. *AUTHORITY OF THE MAGISTRATE JUDGE REGARDING PETITIONERS' MOTIONS*

▇ In petitioners' motion to intervene, petitioners state the following: "The proposed intervenors [petitioners] object to and do not consent to the Magistrate Judge's jurisdiction to adjudicate this motion, the attached motion to vacate or any other aspect of this case." *People Who Care*, No. 89 C 20168 at 4 (N.D. Ill. December 22, 1997, Docket No. 2882).

Petitioners' objection "to the Magistrate Judge's jurisdiction to adjudicate this motion" is without legal effect. The petitioners are not parties to this case. The Seventh Circuit has stated that "§ 636(c)(1) requires consent only by the 'parties.'" *Atlantic Mutual Insurance Company v. Northwest Airlines, Inc.*, 24 F.3d 958 (7th Cir.1994) ("[T]he Council is only a would-be intervenor. It never acquired the status of a party, and § 636(c)(1) requires consent only by the 'parties.' Until it became a party, the Council had no statutory entitlement to exercise choice over the type of adjudicator.")

The existing parties, including the RSD, have consented to the Magistrate Judge's jurisdiction over the remedial phase of this case. Therefore, petitioners' motion to intervene is decided by the Magistrate Judge in this memorandum opinion.

## C. *RULE 24(a)(2)*

In order to establish intervention as of right, petitioners must demonstrate that they have satisfied the requirements of Rule 24(a)(2).

Rule 24(a)(2) of the Federal Rules of Civil Procedure provides that a party seeking to intervene as of right must satisfy four requirements: (1) the application to intervene must be timely; (2) the party must have an interest relating to the property or transaction which is the subject of the action; (3) the party must be so situated that the disposition of the action may, "as a practical matter," impair or impede the party's ability to protect that interest; and (4) the party's interest must not be adequately represented by the existing parties to the action. *See People Who Care v. Rockford Board of Education, School District No. 205*, 68 F.3d 172, 174 (7th Cir.1995), citing *Nissei Sangyo America, Limited v. United States*, 31 F.3d 435, 438 (7th Cir.1994).

### D. PETITIONERS' MOTION TO INTERVENE IS UNTIMELY

Attorney Michael O'Brien attempted to intervene in the *People Who Care* case in order to make the same arguments which the petitioners claim they wish to make regarding the legality of levies pursuant to the Tort Immunity Act. *People Who Care*, 68 F.3d 172 (7th Cir.1995). The District Court denied Mr. O'Brien's motion to intervene as untimely. The District Court's decision was upheld by the Seventh Circuit Court of Appeals. *People Who Care*, 68 F.3d 172 (7th Cir.1995).

Presently before the court is "petitioners'" motion to intervene. The court believes that petitioners' motion to intervene is a rehash of the attempt made by Attorney Michael O'Brien to intervene in the *People Who Care* case. *See People Who Care*, No. 89 C 20168 (N.D. Ill. December 22, 1997, Docket No. 2882).

■ As with the original attempt at intervention, the current motion to intervene is untimely. The most important consideration in deciding whether a motion to intervene is untimely is whether the delay will prejudice the existing parties to the case. *People Who Care*, 68 F.3d 172, 176 (7th Cir.1995). Petitioners' motion to intervene will cause unacceptable prejudice to the existing parties in this case. As pointed out by the Seventh Circuit, "[t]he bonds proposed in the interim orders have already been ordered by the court. In October of 1991, the court ordered the Board of Education to fund school renovations and capital expenditures using the contested bond method, and, in June of 1992, the court ordered the issuance of $10 million in bonds to fund other remedial obligations under the second interim order." *People Who Care*, 68 F.3d 172, 176 (7th Cir.1995). Since the 1995 Seventh Circuit decision, the court has ordered additional Tort Immunity Act levies in amounts counted in the tens of millions of dollars. The RSD has levied pursuant to the Tort Immunity Act to raise this money. Further, "[h]earings have been held on liability, and extensive findings have been made both by the Magistrate Judge and by the district court. A Declaratory Judgment and Permanent Injunction was issued in

1994, and the parties have been formulating remedial programs, and funding for these programs, literally for years." *People Who Care*, 68 F.3d 172, 176 (7th Cir.1995). The petitioners' intervention at this stage "would be significantly disruptive and detrimental to both parties and to the goal of ending discrimination." *See People Who Care*, 68 F.3d 172, 176 (7th Cir.1995).

Altogether, petitioners' motion to intervene is untimely.

### E. PETITIONERS HAVE NO LEGALLY COGNIZABLE INTEREST AND NO STANDING

■ The petitioners have failed to establish an interest relating to the property or transaction which is the subject of the *People Who Care* action. Similarly, petitioners have failed to demonstrate that they have standing to intervene.

Under Article III, Section 2 of the Constitution, federal courts have jurisdiction over disputes only if a "case" or "controversy" exists. This is a "bedrock requirement." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Regarding the case or controversy requirement, the Supreme Court has stated the following: "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

The case or controversy requirement includes the necessary element of "standing" to sue. *Raines v. Byrd*, — U.S. —, —, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997). Intervenors participate on an equal footing with the original parties to the suit. Therefore, a movant for leave to intervene must satisfy the same Article III requirements as the original parties, including the requirement of "standing." *Building and Construction Trades Department, AFL–CIO v. Reich*, 40 F.3d 1275, 1282 (D.C.Cir.1994), citing *City of Cleveland v. Nuclear Regulatory Comm'n*,

17 F.3d 1515, 1517 (D.C.Cir.1994) (per curiam), *Southern Christian Leadership Conference v. Kelley,* 747 F.2d 777, 779 (D.C.Cir. 1984).

To meet the standing requirements of Article III, a party "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Raines v. Byrd,* —— U.S. ——, ——, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997), citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The Supreme Court stated the following regarding the "personal" nature of the injury alleged: "We have consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized to him." *Raines v. Byrd,* 117 S.Ct. 2312, 2317 (1997). *See also Lujan,* 504 U.S., at 560–561 and n. 1, 112 S.Ct., at 2136 and n. 1 (To have standing, the plaintiff must have suffered a "particularized" injury, which means that, "the injury must affect the plaintiff in a personal and individual way.").

In the case of *Bender v. Williamsport Area School District,* 475 U.S. 534, 543–544, 106 S.Ct. 1326, 1332, 89 L.Ed.2d 501 (1986), the Supreme Court concluded that a school board member who "has no personal stake in the outcome of the litigation" has no standing. Because the *Bender* case shares many common issues relating to petitioners' motion to intervene, the court will summarize the relevant facts of *Bender.*

In *Bender,* a group of high school students formed a club for the purpose of promoting "spiritual growth and positive attitudes in the lives of its members." The group asked the principal for permission to hold club meetings on the school premises during student activity periods. The matter was referred to the School Superintendent, who denied permission on the basis of an opinion of the School District Solicitor, and the School Board upheld the denial. The students then filed suit in Federal District Court against the School District, members of the School Board, the Superintendent, and the Principal, alleging that the refusal to allow the club to meet on the same basis as other student groups because of its religious activities violated the First Amendment, and seeking declaratory and injunctive relief. The District Court, on motions for summary judgment, ruled in the students' favor, but entered no injunction and granted no relief against any defendant in his individual capacity. The School District took no appeal, but complied with the judgment and allowed the students' club to conduct the meetings as requested. However, a Mr. Youngman, who was then still a member of the School Board, did appeal. No one raised any question about his standing to appeal, and the Court of Appeals held in his favor. The Supreme Court reversed. *Bender,* 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986).

In the instant case, the December 18, 1997 order entered no injunction and granted no relief against any RSD Board member in his or her individual capacity. *See Bender,* 475 U.S. 534, 539, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) ("No injunction was entered, and no relief was granted against any defendant in his individual capacity."). The court was very specific in this respect, ordering each RSD Board member "in his official capacity" or "in her official capacity," to levy pursuant to the Tort Immunity Act. For example, the court ordered "Carol Bell, in her official capacity as a member of the Rockford Board of Education, School District No. 205 ... to take whatever action is necessary to adopt levies pursuant to the Illinois Tort Immunity Act ...". *People Who Care,* No. 89 C 20168 (N.D. Ill. December 18, 1997, Docket No. 2862). *See Bender,* 475 U.S. 534, 537, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) ("[T]he specific allegation concerning each of the named members of the [School] Board was in this form: 'John C. Youngman, Jr., is a member of the Williamsport Area School Board and is sued in that capacity.' ").

After the court's December 18, 1997 order, the RSD Board voted 6–0 to levy pursuant to the Tort Immunity Act. The RSD Board did not vote to appeal the court's December 18, 1997 order. Rather, the RSD Board tied 3–3 when they voted regarding a possible appeal of the December 18, 1997 order. The RSD Board made no motion to stay the court's December 18, 1997 order. *See Bender,* 475

U.S. 534, 539, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) ("The School District did not challenge the judgment of the District Court in any way. It made no motion for a stay and took no appeal. Instead, it decided to comply with the judgment . . .".).

As members of the RSD Board, ordered to take action in their official capacities, the petitioners have no personal stake in the matters for which they move to intervene. Therefore, petitioners have no standing to become intervenors in the instant case. *See Bender*, 475 U.S. 534, 543, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) ("As a member of the School Board sued in his official capacity, Mr. Youngman has no personal stake in the outcome of the litigation and therefore did not have standing to file the notice of appeal.").

An order directing public officials, such as School Board members, to act in their official capacities imposes liability on the public entity. Regarding the December 18, 1997 order, no liability was imposed on the RSD Board members in their individual capacities. *See Brandon v. Holt*, 469 U.S. 464, 471–472, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) ("[A] judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents . . .".).

Therefore, the petitioners' status as School Board members does not permit them to step into the shoes of the RSD Board and invoke its right to appeal the December 18, 1997 order. The vote of the RSD Board determined that the RSD Board would not appeal the December 18, 1997 order. Individual Board members cannot circumvent the RSD Board's own vote and take up an appeal themselves. *See Bender*, 475 U.S. 534, 544, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) ("Mr. Youngman's status as a School Board member does not permit him to 'step into the shoes of the Board' and invoke its right to appeal."). In this respect the Supreme Court has stated the following:

Generally speaking, members of collegial bodies do not have standing to perfect an appeal the body itself has declined to take. The Court of Appeals for the District of Columbia Circuit so held in *Smuck v. Hobson*, 132 U.S.App.D.C. 372, 374–375, 408

F.2d 175, 177–178 (1969) (en banc) (footnote omitted):

"We also find that Mr. Smuck has no appealable interest as a member of the Board of Education. While he was in that capacity a named defendant, the Board of Education was undeniably the principal figure and could have been sued alone as a collective entity. Appellant Smuck had a fair opportunity to participate in its defense, and in the decision not to appeal. Having done so, he has no separate interest as an individual in the litigation. The order directs the Board to take certain actions. But since its decisions are made by vote as a collective whole, there is no apparent way in which Smuck as an individual could violate the decree and thereby become subject to enforcement proceedings."

*See id.*, at 387, 408 F.2d at 190 (McGowan, J., concurring in part and concurring in result).

*Bender*, 475 U.S. 534, 544–545, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). Consequently, individual RSD Board members have no power to appeal decisions of the RSD Board as a whole. Permitting individual RSD Board members to intervene so that decisions of the RSD Board can be circumvented would be akin to permitting individual citizens to appeal decisions of the RSD Board.

The petitioners assert that they have a personal stake and a resulting right to intervene arising from the December 18, 1997 order in the form of (1) effect on petitioners' "political reputation;" (2) an inability to "vote their consciences;" and (3) the loss of the "effectiveness" of their votes.

The court is aware of no legally cognizable personal stake in the "political reputation" of elected officials, especially in the context of Rule 24(a)(2) and/or the standing requirement of Article III. Further, petitioners have not cited to any relevant legal authority in this respect.

Regarding the petitioners' claim that they were unable to "vote their consciences" because of the December 18, 1997 order, the petitioners have failed to demonstrate a personal stake. In *Board of Education v. Allen*,

392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), the Supreme Court recognizes a "personal stake" for individual legislators when they face the possibility of expulsion from office. The court never stated or intimated that the RSD Board members faced the possibility of expulsion from office if they voted against the Tort Fund Act levy. Further, the Plaintiffs' motion for sanctions against the individual RSD Board members was withdrawn in January 1998.

Petitioners also claim a personal stake due to an alleged loss of the "effectiveness" of their votes. Petitioners cite the case of *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), and the case of *Raines v. Byrd,* —— U.S. ——, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), to support petitioners' claimed personal stake in the effectiveness of their votes. In *Coleman,* the Supreme Court explained that "the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions that their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct, and adequate interest in maintaining the effectiveness of their votes." *Coleman,* 307 U.S. 433, 438, 59 S.Ct. 972, 83 L.Ed. 1385 (1938). In *Raines v. Byrd,* the Supreme Court discussed the *Coleman* case when it held that individual members of Congress do not have a personal stake sufficient to invalidate the Line Item Veto Act: "It is obvious, then, that our holding in *Coleman* stands (at most, see n. 8, infra) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines v. Byrd,* —— U.S. ——, ——, 117 S.Ct. 2312, 2319, 138 L.Ed.2d 849 (1997).

First, the court notes that the factual scenarios of *Coleman* and *Raines* are wildly distinguishable from the instant case. In *Coleman,* the Supreme Court examined issues including state ratification of amendments to the U.S. Constitution and the justiciability thereof. *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). In *Raines,* members of Congress claimed diminution of their voting power due to the Line Item Veto Act. *Raines v. Byrd,* —— U.S. ——, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).

Second, the court reminds the petitioners that the Rockford Board of Education, School District No. 205 has been found guilty of intentional and blatant discrimination against Black and Hispanic students. *See People Who Care,* 851 F.Supp. 905 (N.D.Ill. 1994); *People Who Care v. Rockford Bd. of Educ.,* 111 F.3d 528, 531 (7th Cir.1997) ("[T]he District Judge found that the school district had intentionally discriminated against Black and Hispanic students in violation of the equal protection clause of the Fourteenth Amendment ."). A remedial decree has been entered in the form of the Comprehensive Remedial Order ("CRO"). *See People Who Care,* 111 F.3d 528, 532 (7th Cir.1997). The RSD is years away from unitary status. The court's view is quite simple: The court must be able to order the RSD to follow the CRO. School District action is taken by votes of the RSD Board. If the court may not order the RSD Board to take certain actions as part of their official duties, the court is powerless to enforce the very CRO which has already been appealed to the Seventh Circuit Court of Appeals. In this sense, the RSD Board's voting effectiveness has been limited, in order to remedy the RSD's repeated violations of fundamental, Constitutionally protected rights to equal protection under the law.

### F. THE TORT IMMUNITY ACT FUNDING ISSUE IS NOT "CAPABLE OF REPETITION, YET EVADING REVIEW"

Petitioners argue that issues surrounding their votes on Tort Immunity Act levies are capable of repetition, yet evading review.

■ The court disagrees. The Illinois courts may provide definitive guidance by December 1998 regarding use of Tort Immunity Act levies to fund civil rights remedies.[3]

---

3. In this context, the court notes that the Seventh

Circuit Court of Appeals declined to rule on the

Further, the RSD Board vacancy no longer exists. As explained in Footnote 1 above, on February 18, 1998, William Neblock was appointed by the Regional Superintendent Fairgraves to fill the vacancy on the RSD Board following William Neblock's December 8, 1997 resignation. Therefore, the RSD Board will not again deadlock regarding a possible appeal of District Court orders, as they did in December 1997.

### G. RULE 24(b)(2)

In the Seventh Circuit, permissive intervention is largely within the discretion of the District Court. *Shea v. Angulo,* 19 F.3d 343 (7th Cir.1994) (reversal of district court's decision denying permissive intervention " 'is a very rare bird indeed, so seldom seen as to be unique.' ").

The court believes that petitioners have not met the requirements for permissive intervention pursuant to Rule 24(b)(2) of the Federal Rules of Civil Procedure. As explained above, petitioners' motion for permissive intervention must be denied for the following reasons: (1) petitioners' motion to intervene has not been timely; and (2) petitioners' intervention would cause undue prejudice to the existing parties in the *People Who Care* case.

### IV. CONCLUSION

Petitioners' motion to intervene, filed December 22, 1997, is denied. Further, petitioners' companion motion to vacate order, filed December 22, 1997, is also denied.

validity of taxes levied pursuant to the Illinois Tort Immunity Act. *Matter of County Collector,*